J-S28002-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: N.C.M.L., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.N. AND E.N. | : : : : : : : : | |
| | : | No. 2039 MDA 2018 |

Appeal from the Order Entered November 14, 2018
In the Court of Common Pleas of Northumberland County Orphans' Court
at No(s):  Adoptee 42-2016
CP-49-DP-0000052-2015

BEFORE:   BOWES, J., McLAUGHLIN, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.:                          **FILED JULY 17, 2019**

D.N. and E.N. (collectively, "Maternal Grandparents") appeal from the November 14, 2018 orphans' court order dismissing their petition to adopt their granddaughter, N.C.M.L. (hereafter, "N.L."), and allowing the competing adoption petition filed by M.C. and K.C. ("Foster Parents") to proceed.  We affirm.

The oprhans' court summarized the relevant procedural and factual history as follows:

> N.L. is currently three and a half years old.  . . . On July 28, 2015, [Children and Youth Services of Northumberland County ("CYS")] received a referral from a local hospital due to the child's failure to thrive.  On July 29, 2015, [CYS] received a verbal order from the [c]ourt for [it] to care for the child.  [D.N. ("Maternal Grandmother")] wanted to be considered as a placement option, however, it was discovered that her husband [E.N. ("Maternal Step-Grandfather")] had a prior referral of physical abuse and[,] thus[,] the minor child was placed in [f]oster [c]are.

---
*   Retired Senior Judge assigned to the Superior Court.

On August 5, 2015, . . . the minor was found to be dependent and it was ordered that she remain in the physical and legal custody of [CYS.]

Trial Court Opinion, 11/13/18, unnumbered at 1.

On August 21, 2015, after an initial placement in a different foster home, N.L. was placed with Foster Parents, where she has remained.[1] On the same date, Maternal Grandmother filed a petition for custody. While initially listed for a hearing in September 2015, the custody petition was subsumed by the pending dependency matter in juvenile court. *Id*. Thus, Maternal Grandmother filed several petitions to intervene in the dependency proceeding, wherein she sought physical custody of N.L., or alternatively, kinship placement. On June 29, 2016, the juvenile court found that Maternal Grandmother had standing to intervene and extended her periods of supervised visitation.[2] Over the ensuing eight months, the supervised

---

[1] Although CYS did not consider Maternal Grandmother a placement option, based in part upon Maternal Step-Grandfather's record of child abuse, the birth mother openly objected to her daughter's placement with Maternal Grandmother because of her experiences with physical abuse while she was living in Maternal Grandmother's household. Moreover, we observe that CYS denied Maternal Grandmother's previous attempt to foster children due to the combination of financial concerns and Maternal Step-Grandfather's history of child abuse.

[2] The court stated,

We do have several issues at play here and I don't want to overlap them. I do believe that you established standing for [Maternal Grandmother], but there are other issues that will have to be dealt with. One doesn't necessarily follow the other.

visitation progressed to unsupervised community visits, and eventually developed into periods of overnight custody, which Maternal Grandmother has exercised since February 2017.[3]

The juvenile court held permanency review hearings at regular intervals and found that it was in N.L.'s best interest to remain in CYS custody and to maintain placement with Foster Parents. CYS eventually petitioned for the termination of parental rights under the Adoption Act. On March 16, 2017, the orphans' court terminated the parental rights of the birth father. The birth mother relinquished her rights voluntarily on the same date. Thereafter, on April 19, 2017, Maternal Grandparents filed a petition to adopt N.L., and Foster Parents countered on May 16, 2017, with their own adoption petition and the required report of intention to adopt.[4] Meanwhile, on June 1, 2017, the juvenile court appointed Robert Meacham, M.S., to perform a psychological

---

. . . .

But I'm granting the standing for your client[.]

N.T., 6/29/16, at 51.

[3] On March 2, 2018, the juvenile court suspended Maternal Step-Grandfather's participation in the visitations due to additional allegations of child abuse. The suspension was lifted on May 25, 2018. In the interim, Maternal Grandmother's visitation was restricted to agency-approved locations. As of the date of the adoption hearings, Maternal Grandparents exercised visitation with N.L. on alternating weekends.

[4] Grandparents are relieved from the requirement to file a report of intention to adopt. 23 Pa.C.S. § 2531(c).

evaluation and a bond analysis for each of the prospective parents as part of the permanency review proceedings.[5]

The orphans' court expressly consolidated the dependency matter with the ongoing adoption proceedings and conducted hearings on the competing petitions for adoption on February 2, 2018, September 6, 2018, and September 7, 2018.[6] Maternal Grandparents as well as Foster Parents were represented by counsel. The parties testified themselves and presented various relatives, church members, and caseworkers from CYS and its service providers as witnesses. CYS recommended that the court grant Foster Parents' adoption petition.

On November 14, 2018, the orphans' court entered an order dismissing Maternal Grandparents' petition for adoption and permitting the petition filed by Foster Parents to proceed.[7] The orphans' court outlined its rationale as follows:

---

[5] While the expert's name appears in the documents as both Meacham and Meachum, the certified record confirms that Meacham the correct spelling.

[6] [N.L.] was represented by both a guardian *ad litem*, as well as legal counsel, who each participated in the proceedings. Each submitted briefs to this Court supporting the dismissal of Maternal Grandparents' petition for adoption and favoring the court's decision to permit Foster Parents' to proceed toward adoption.

[7] The orphans' court initially entered an order on November 13, 2018, which simply granted Foster Parents' petition for adoption. However, the following day, the court vacated that order and entered the operative order that

On June 1, 2017, Robert Meacham, M.S., Licensed Psychologist[,] was ordered to conduct a [p]sychological evaluation for [p]ermanency[,] which was to include an "assessment of the parenting capacity, risk assessment and observations regarding the bond of the child with any of the potential caretakers." He was further ordered to make specific recommendations and all parties were ordered to fully cooperate.

Mr. Meacham submitted his report to the [c]ourt on October 6, 2017.[8] Among his findings are the following:

1. Both [Maternal Grandparents] and the [Foster Parents] have the ability to parent the minor effectively.

2. Since the minor was placed with [Foster Parents] and[,] due to their nurturance and care, the child has progressed to the point where "her growth, height and weight have reached normative, healthy developmental levels. Such improvement endorses the level of care consistently provided in [Foster Parents'] home."

---

explicitly dismissed Maternal Grandparents' petition and permitted the petition filed by Foster Parents to proceed.

[8] Mr. Meacham testified consistently with his report on October 20, 2017. We observe that notwithstanding this Court's directive to the orphans' court to supplement the certified record pursuant to Pa.R.A.P. 1926, the notes of testimony for this proceeding, as well as Mr. Meacham's report, are not a part of the certified record. While the parties referenced the report as being part of the record during the February 2, 2018 hearing, the document was never marked and/or admitted on the record at the hearing. *See* N.T., 2/2/18, at 176. Nevertheless, the notes of testimony and report are included as part of the reproduced record submitted by Appellants as CYS Exhibit 2 and CYS Exhibit 3, respectively. Likewise, they are similarly referenced in Foster Parents' counter-designation of the reproduced record. As such, and since there is no dispute as to the accuracy of these exhibits, we will consider the orphans' court's representations of the report. *See Commonwealth v. Barnett*, 121 A.3d 534, 544 n.3 (Pa.Super. 2015) ("[W]here the accuracy of a document is undisputed and contained in the reproduced record, we may consider it.").

3. The evaluator visited both homes and found that each meets acceptable standards of care for the minor. There were no safety concerns in either home, although [Foster Parents'] home was much more clean, neat and highly organized.

4. Both sets of adoptive parents have the financial means to support the minor.

5. The minor is doing well emotionally, physically and medically. She attends preschool with no issues. She has spent her critical, developmental years with [Foster Parents].

6. The evaluator then reviewed studies of children this age and concluded that he understands Grandmother's desire to adopt, but there is no reason to "disrupt the primary caretaking situation for the minor." His research suggests it is harmful to a young child to disrupt a consistent, nurturant and well-functioning placement during this stage in a child's life.

7. The minor child refers to [Foster Parents] as "Mommy" and "Daddy". She refers to her grandparents as "Mi-Mi" and "Pappy". The minor child views [Foster Parents] as her parents and [Maternal Grandparents] as her grandparents.

8. As per the evaluator, the minor child is fortunate to have two families willing to adopt and care for her. But, [Foster Parents] have raised her for the majority of her life and there is an attachment to them and their extended family.

9. The "status quo whereby the minor resides with [Foster Parents] as her primary place of residence has been working to her best interest. "Continuing to reside with [Foster Parents] as adoptive parents, while maintaining a visitation schedule with [Maternal Grandparents,] would essentially provide the minor with a parent and grandparent relationship that would

support her developmental needs for many years to come."

The evaluator thereafter made the following recommendation:

"The minor child's long term interest would be best served by a configuration of permanency resembling the status quo whereby she resides in the home of [Foster Parents] as an adoptive family while spending time with [Maternal Grandparents] in a manner reflective of their role as grandparents."

Trial Court Opinion, 11/13/18, at unnumbered 1-2.

Maternal Grandparents filed a timely notice of appeal on December 14, 2018, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court entered a statement in lieu of opinion incorporating the reasoning that it provided in the opinion that accompanied the previous order.

Maternal Grandparents present the following issues for our review:

A. Whether the trial court erred in dismissing the adoption petition of [Maternal Grandparents] and granting the adoption [petition] of [Foster Parents] because [CYS] failed to file the Consent to Adopt and Report of Intermediary as required by [23] P[a].C.S.A. [§] 2533[?]

B. Whether the trial court erred in dismissing the adoption petition when it failed to hear [Maternal Grandmother's] Complaint for Custody in violation of the Custody Act[?]

C. Whether the trial court erred in dismissing the adoption petition of [Maternal Grandparents] when it birfurcated [sic] the competing adoption hearings, delaying the final hearing by more than six (6) months[?]

D. Whether the trial court erred in dismissing the adoption petition of [Maternal Grandparents] when it failed to make the requisite

findings regarding family finding efforts of [CYS] throughout the dependency action[?]

E. Whether the trial court erred in dismissing the adoption petition of [Maternal Grandparents] when it impermissibly gave considerable weight to the indication of abuse on record [E.N.] in violation of Act 160 of 2004[?][9]

Maternal Grandparents' brief at 4.

This Court reviews a determination under the Adoption Act for an abuse of discretion. *In re K.D.*, 144 A.3d 145, 151 (Pa.Super. 2016). We will not conclude that there is an abuse of discretion "merely because a reviewing court would have reached a different conclusion." *Id.* (citation omitted). Rather, "[a]ppellate courts will find a trial court abuses its discretion if, in reaching a conclusion, it overrides or misapplies the law, or the record shows that the trial court's judgment was either manifestly unreasonable or the product of partiality, prejudice, bias or ill will." *Id.* (citation omitted).

We have stated, "[i]n both custody and adoption matters, our paramount concern is the best interests of the child. This 'best interests' determination is made on a case-by-case basis, and requires the weighing of all factors which bear upon a child's physical, intellectual, moral, and spiritual well-being." *In re Adoption of A.S.H.*, 674 A.2d 698, 700 (Pa. Super. 1996) (citations omitted); *see also* 23 Pa.C.S. § 2902(a).

---

[9] Act 160 of 2004 refers to the Child Protective Services Law ("CPSL"), 23 Pa.C.S. §§ 6301-6385.

When this Court reviews a trial court's "best interests" analysis in custody and adoption matters, our scope of review is as follows:

> An appellate court is not bound by findings of fact made by the trial court which are unsupported in the record, nor is it bound by the court's inferences drawn from the facts. However, on issues of credibility and weight of the evidence, an appellate court defers to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses. Only where it finds that the custody order is manifestly unreasonable as shown by the evidence of record will an appellate court interfere with the trial court's determination.

**A.S.H.**, **supra** at 700 (citations and internal quotation marks omitted).

Moreover,

> once the parental rights have been terminated, anyone may become an adoptive parent, and the best interest of the child is the controlling factor by which a court must be guided. Furthermore, a trial court must base its conclusions in an adoption case upon all relevant information discerned with the full participation of all interested parties.

**In re Adoption of D.M.H.**, 682 A.2d 315, 319 (Pa.Super. 1996) (citations omitted).

Further,

> A party seeking to adopt a child must first file a Report of Intention to Adopt. 23 Pa.C.S. § 2531(c). A report is also filed by the intermediary who arranged the adoption, and an investigation is conducted to determine the suitability of the adoption. 23 Pa.C.S. § 2535. Once the proposed adoption is determined to be feasible, the adoption procedure is commenced. 23 Pa.C.S. § 2701 *et seq.* A Petition to Adopt must be filed, and the court shall obtain any necessary consents to the adoption. 23 Pa.C.S. § 2711(a). The court then holds a hearing for a final determination of whether the adoption decree should be entered. 23 Pa.C.S. § 2721. At all stages of the proceedings, the best interest of the child is the paramount consideration. **See** 23 Pa.C.S. § 2902(a).

***In re Adoption of Hess,*** 608 A.2d 10, 13 (Pa. 1992) (footnotes omitted).

Maternal Grandparents first contend that CYS's written report was not submitted within six months as required, and did not include the agency's consent to adoption. Maternal Grandparents' brief at 10-11. The crux of this assertion is that the procedural defects invalidate the orphans' court's decision to dismiss their adoption petition in favor of the cross petition filed by Foster Parents. They argue,

> the Report of the Intermediary and Agency Consent to Adoption was filed on November 28, 2018. This was fourteen days after the adoption order was entered. Foster [P]arents filed their petition to adopt and report of intention to adopt on May 16, 2017. According to [23] Pa.C.S.A. [§] 2533, the intermediary [a]gency was mandated to file their written report under oath to the court within six months after Foster [P]arents filed their report of intention to adopt. Here, [CYS] filed their report one and a half years after the report of intention to adopt was filed. [CYS's] consent was also filed on November 28, 2018, and likewise is not in compliance with the law as the consent must be filed with the report of intermediary per 23 Pa.C.S.A. [§] 2533(7), which provides that . . . "all consents required by section 2711 (relating to consents necessary to adoption) are attached as exhibits."
>
> It is important that courts in adoption proceedings adhere to [s]tate [l]aws regarding adoptions. The official comment— 1970 to 23 Pa.C.S.A. [§] 2533 notes that "[t]he report, now required of all intermediaries, will provide the court with much of the information which previously was required to be included in the adoption petition. Including the information in the report[,] rather than in the petition[,] helps to preserve anonymity between natural and adopting parents. 23 Pa.C.S.A. [§] 2533 (Official Comment—1970). Despite the fact that there is no anonymity in this case, it is the [l]aw of Pennsylvania and the plain language requires that the report of intention to adopt,[10] which includes

---

[10] It appears that there is a typographical error and that Maternal Grandparents meant to say Report of the Intermediary here.

the consent to be attached, must be filed within six months after filing the report of intention to adopt.  These documents were not attached and[,] thus[,] the [orphans'] court['s] adoption order is deficient and[,] as such[,] should be stricken.

*Id*.  For the following reasons, we disagree with Maternal Grandparents' fundamental premise that CYS's admitted delay in filing its report and consent to adoption in favor of Foster Parents somehow invalidated the orphans' court order dismissing Maternal Grandparents' adoption petition.  The two events are not coextensive.  Stated another way, notwithstanding the agency's delay in filing its formal consent and support of Foster Parents' petition, the evidence sustains the orphans' court's decision to dismiss Maternal Grandparents' adoption petition in favor of permitting Foster Parents' cross petition to proceed.

Section 2533 of the Adoption Act provides as follows with regard to the report of an intermediary:

> **(a) General rule.**--Within six months after filing the report of intention to adopt, the intermediary who or which arranged the adoption placement of any child under the age of 18 years shall make a written report under oath to the court in which the petition for adoption will be filed and shall thereupon forthwith notify in writing the adopting parent or parents of the fact that the report has been filed and the date thereof.
>
> **(b) Contents.**--The report shall set forth:
>
> . . . .
>
> (7) A statement that all consents required by section 2711 (relating to consents necessary to adoption) are attached as exhibits or the basis upon which the consents are not required.

23 Pa.C.S. § 2533 (a) and (b)(7). Typically, a foster parent must obtain the consent of the child service agency that maintains custody; however, the agency's decision to withhold consent is not dispositive. *In re Adoption of J.E.F.*, 902 A.2d 402, 418 (Pa. 2006) ("hold[ing] that the custodial agency's refusal to consent to [foster parents'] petition to adopt does not, by itself, operate to deprive [them] of standing to participate").

Instantly, there is no dispute that CYS filed its report approximately one and one-half years late. However, Maternal Grandparents failed to provide any meaningful legal support or cite authority for the proposition that this fact affords them relief or alters the reality that the orphans' court dismissed their adoption petition due to its lack of merit. Stated plainly, Maternal Grandparents' reference to the statutory requirements is not dispositive because there is no evidence of prejudice as a consequence of the tardy filing. Importantly, as noted by the comments to the statute, this requirement was intended to preserve anonymity and to eliminate delay in the adoption process. *See* 23 Pa.C.S. § 2533 (Official Comments—1970, 1980). Instantly, anonymity is irrelevant given the long-standing relationship between the parties throughout the dependency proceedings and in light of N.L.'s continuous placement with Foster Parents, parental figures with whom she has resided since August 2015.

Moreover, CYS's consent to Foster Parents' adoption was not only known but also undisputed. Pursuant to the CYS solicitor's report dated December

12, 2017, and filed December 13, 2017, the agency consented to, and requested that, Foster Parents be permitted to proceed with adoption. *See* Solicitor's Report, 12/13/17, at 7-8. Similarly, at the hearing on September 6, 2018, CYS permanency supervisor, Megan Weaver, confirmed the agency's recommendation favoring the adoption of N.L. by Foster Parents.[11] N.T., 9/6/18, at 34. Accordingly, the agency documented its consent to Foster parents' adoption long before it formally entered the consents in November 2018, and there is no indication that the result would have been any different had CYS complied with the time requirements. As such, Maternal Grandparents' argument warrants no relief.

Next, Maternal Grandparents claim that the orphans' court erred in failing to consider Maternal Grandmother's complaint for custody, which she filed during the dependency proceedings within one month of Mother and N.L. moving out of Maternal Grandmother's residence, and within several weeks of N.L.'s placement. Maternal Grandparents' brief at 13. Maternal Grandparents contend, "Grandmother filed her custody complaint in August 2015[,] the

---

[11] Ms. Weaver testified that she agreed with CYS's recommendation that Foster Parents adopt N.L. because the proposed adoption serves the child's best interest. N.T., 9/6/18, at 34-35. Specifically, Ms. Weaver noted the parent-child relationship that developed over the extended period that N.L. resided with Foster Parents and observed that N.L.'s relationship with Maternal Grandparents was that of a typical grandchild. *Id*. at 34, 39-40. She stated, in part, "I think the bottom line for me is just the length of time that [N.L.] has lived with [Foster Parents] and [her belief that,] for all intents and purposes[,] . . . they are her parents and really knows no difference[.]" *Id*.

same month that the minor child was placed with the foster parents herein. Had Grandmother been permitted her day in court and succeeded, we would not be here today and there would be no attachment to [F]oster [P]arents." *Id*.

As to the relationship between dependency and custody, this Court has noted, "a dependency determination is a prerequisite to a disposition of the custody issue." *In re A.E.*, 722 A.2d 213, 215 (Pa.Super. 1998) (citing 42 Pa.C.S. § 6341(c)). *See also Helsel v. Blair County Children and Youth Services*, 519 A.2d 456, 461 (Pa.Super. 1986)).

Instantly, the juvenile court allowed Maternal Grandmother to intervene in the dependency matter. Throughout those proceedings, the juvenile court considered the best interests of the child with respect to placement and custody. The court conducted regular permanency review hearings at which it determined that the evidence supported maintaining custody with CYS and placement with Foster Parents.

Critically, at the time of placement, Maternal Grandmother was not considered an option due to Maternal Step-Grandfather's abuse history.[12] N.T., 9/7/18, at 40; N.T., 6/29/16, at 63, 71, 74. Additionally, Mother did not agree to a safety plan placing N.L. with Maternal Grandmother due to concerns

---

[12] Maternal Step-Grandfather testified to physically disciplining the son of a prior fiancée at least thirteen years earlier. N.T., 2/2/18, at 71-75.

surrounding Mother's abuse by a former boyfriend of Maternal Grandmother while being raised in Maternal Grandmother's household. N.T., 6/29/16, at 35-36, 57-59. Nevertheless, Maternal Grandmother was provided with visitation, which expanded over time. N.T., 2/2/18, at 132, 135-37, 147-48.

Thereafter, the parties filed their countervailing petitions for adoption. Throughout the relevant adoption proceedings, the orphans' court was again guided by the best interests of the child as supported by the evidence and we discern no abuse of discretion. Moreover, the certified record belies Maternal Grandmother's complaint that the respective juvenile and orphans' courts denied her the opportunity to prove that maintaining primary physical custody of N.L. would serve the child's best interest. No relief is due.

Maternal Grandparents next claim that the court erred in bifurcating the hearings as to the petitions to adopt and delaying a final hearing by six months. Maternal Grandparents' brief at 16. Maternal Grandparents argue,

> Maternal grandparents were severely prejudiced in the more than six[-]month delay between hearings during the adoption proceedings in the trial court. The trial court in its opinion pointed to the evaluator who concluded that "there is no reason to disrupt the primary caretak[er] situation for the minor." [Trial Court] Opinion dated 11/13/18. The only reason that [F]oster [P]arents are the primary caretak[ers] . . . is because of the trial court's delay which is extremely prejudicial to the Maternal Grandparents herein.

*Id*.

Upon review, this claim also fails. As indicated, the hearings concerning the dueling petitions for adoption filed by Maternal Grandparents and Foster

Parents were held on February 2, 2018, and September 6 and 7, 2018, respectively, with Maternal Grandparents presenting their evidence during February and Foster Parents presenting their evidence in September. Tellingly, Maternal Grandparents provide no legal support for their contention that the delay between hearings was error and cause for relief. While the delay between hearings is regrettable, the orphans' court indicated that it will make scheduling adjustments in the future to help alleviate any backlog. Trial Court Opinion, 11/13/18, unnumbered at 3 n.2.

> We need not be chastised by the appellate [c]ourts for the delay. This [c]ourt as the [d]ependency [c]ourt is overwhelmed with these proceedings and in the next year, three days are now being devoted to move these proceedings along. We agree that in circumstances such as these the [c]ourts need to "move matters along[!"]

*Id*. Further, there is no evidence of any prejudice or negative impact to Maternal Grandparents as a result. Notably, Mr. Meacham's report, which supported maintaining the status quo and custody with Foster Parents, was issued in October 2017, four months prior to the first adoption hearing in February 2018. *See* CYS Exhibit 3. N.L. had resided with Foster Parents for two years at the time. No evidence suggests that the result would have been different had the hearings been completed the following day or any time prior to September 2018.

With their fourth claim, Maternal Grandparents assert error in making the requisite family finding efforts on the part of CLS. Maternal Grandparents' brief at 17-18. Maternal Grandparents state, "Specifically, the lower court and

[CYS] did not look at the supportive community ties with family, friends, and neighbors. The lower court dismissed the existing family relationships, attitudes and expectations regarding Maternal Grandparents." *Id*. at 18.

Pursuant to 62 P.S. § 1302.1, "Family finding shall be conducted for a child when the child is accepted for services and at least annually thereafter, until the child's involvement with the county agency is terminated or the family finding is discontinued in accordance with section 1302.2." Further, "[f]amily finding" is defined as follows:

> Ongoing diligent efforts between a county agency, or its contracted providers, and relatives and kin to:
>
> (1) Search for and identify adult relatives and kin and engage them in children and youth social service planning and delivery.
>
> (2) Gain commitment from relatives and kin to support a child or parent receiving children and youth social services.

62 P.S. § 1302. However, despite the objectives and efforts of family findings, "[t]he court may place children with a foster family, although there might be willing relatives, where foster care is in the best interests of the children or aggravated circumstances exist." *In re Adoption of G.R.L.*, 26 A.3d 1124, 1127 (Pa.Super. 2011); *see also In re R.P.*, 957 A.2d 1205 (Pa.Super. 2008) (holding court properly declined proposed kinship care arrangement due to aggravated circumstances, where mother knew father was abusing child but failed to protect child from further abuse; children's grandfather was widower with pacemaker who lived close to father, and children's uncle had no experience in raising children; placement of children with relatives would put

- 17 -

children at further risk of abuse); ***In re C.J.R.,*** 782 A.2d 568 (Pa.Super. 2001) (holding court properly declined to remove children from foster home and place them with biological grandparents, where removal from foster home could stunt positive gains in belated development due to "failure to thrive" diagnosis, and grandparents came from dysfunctional family environments).

Upon review, this claim also fails. The permanency review order entered on October 29, 2015, states the juvenile court's initial finding that the requirements of Pa.R.J.P. 1149 as to family finding were satisfied, and the juvenile court re-affirmed this finding at each subsequent permanency review hearing. **See** Permanency Review Order, 10/29/15, at 2; Juvenile Court Docket. Notably, the juvenile court reached a similar conclusion in the permanency review orders entered on December 27, 2017, immediately prior to the commencement of the adoption proceedings, as well as June 18, 2018, between the relevant hearings. Permanency Review Order 6/18/18, at 2; Permanency Review Order 12/27/17, at 2. Further, CYS mailed kinship letters in June 2016, and completed home studies with respect to both the maternal

great-grandmother[13] and Maternal Grandmother.[14] Notwithstanding all of the foregoing efforts, the juvenile court held regular permanency review hearings and found that it was in N.L.'s best interest to maintain custody with CYS and placement with Foster Parents.

Lastly, Maternal Grandparents assert that the trial court placed undue weight on the allegations of abuse concerning Maternal Step-Grandfather's corporal punishment of his then-fiancée's child. As told by Maternal Step-Grandfather, "I . . . bent him over my knee, smacked him two times on the butt and stood him in the corner" as discipline for striking another child in the face with the heel of a dress shoe. N.T., 2/2/18, at 71-75. The incident resulted in an indicated finding of abuse under the CPSL, which was subsequently expunged on March 2016, approximately three months before Maternal Grandmother commenced the kinship application process. N.T., 6/29/16, at 99.

Maternal Grandparents argue, "The trial court erred in dismissing the adoption petition of [Maternal Grandparents] when it impermissibly gave

---

[13] Pursuant to Permanency Review Order dated June 29, 2016, and entered July 1, 2016, the court ordered that ". . . Maternal great grandmother, [L.F.], will no longer be considered as a kinship placement option for the minor child regardless of her approved home study. This is a result of the testimony as well as her absence at the hearing." Permanency Review Order, 7/1/16, at 3; **see also** N.T., 6/29/16, at 89-99.

[14] Aside from Maternal Grandmother and the maternal great-grandmother, CYS mailed kinship letters to at least two other relatives, including the maternal grandfather, C.W., who was not a viable kinship option due to the nature of his employment and the inability to raise a child properly at the time. N.T., 6/29/16, at 126, 170.

considerable weight to the indication of abuse on the record of [Maternal Step-Grandfather]. The lower court erroneously considered Maternal [Step- ]Grandfather's criminal and abuse history even though his record was expunged." *Id*. at 19 (citation to record omitted). They continue, "The expunged records are only available to certain government agencies such as local and federal law enforcement as well as criminal prosecutors and judges in the event of future offenses. The expungement allows the convict to re-enter society without the stigma and prejudice which follow those with criminal records." *Id*.

Instantly, we discern no abuse of discretion. Despite referencing Maternal Step-Grandfather's criminal and abuse history in presenting its findings, the court focused on Maternal Step-Grandfather's health and his comments and attitudes towards others, as reflected on social media. Trial Court Opinion, 11/13/18, unnumbered at 3-4. The court explained,

> We, however, will express our concerns with her current husband, [E.N.]. He does have a criminal and abuse history, although admittedly not towards the minor. This [c]ourt is seriously concerned with his comments on social media. His comments and attitudes towards others can best be described as inflammatory and prejudiced. While his social media posts are of concern, even more so are his health issues. The maternal grandfather has kidney issues, to the point where [function] is reduced to 20%. He downplays the seriousness thereof, but we consider it a factor as we do his rants, raves and boasting on social media. Furthermore, his comments on social media concerning his state of health are at total odds with his testimony that he is in good health.

*Id*.

As the orphans' court's discussion of Maternal Step-Grandfather's past conduct is limited to an isolated reference in the four-page opinion, we discern no trial court error. The court did not base its decision on the abuse allegations or even mention them in any other context. More importantly, the court's ultimate rationale rested upon the man's inflammatory rants on social media and his lack of candor concerning his serious physical health problems. Thus, notwithstanding Maternal Grandparents' protestations to the contrary, the orphans' court's reference to the prior incident of abuse is not tantamount to legal error.

For all of the foregoing reasons, we affirm the orphans' court order dismissing the petition for adoption filed by Maternal Grandparents and permitting the cross-petition filed by Foster Parents to proceed.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/17/2019